# FOR PUBLICATION

FILED & ENTERED

SEP 30 2022

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY hawkinso DEPUTY CLERK

**UNITED STATES BANKRUPTCY COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**RIVERSIDE DIVISION**

| | |
|---|---|
| In re: | Case No.: 6:13-bk-16964-MH |
| NARINDER SANGHA | Chapter: 7 |
| | Adv. No.: 6:13-ap-01171-MH |
| Debtor | **MEMORANDUM DECISION AFTER TRIAL** |
| CHARLES SCHRADER | |
| Plaintiff | Trial Held: |
| v. | **Dates:** August 24-25, 2021; January 24, 2022<br>**Courtroom**: 301<br>**Place:** 3420 Twelfth St.<br>Riverside, CA 92501 |
| NARINDER SANGHA | |
| Defendant | |

*I.        Introduction*

In the matter before the Court, Charles Schrader ("Plaintiff") asks the Court to apply collateral estoppel to a California state court defamation judgment, and ultimately find for Plaintiff on his § 523(a)(6) cause of action. Fundamentally, this case is in material part about whether the bankruptcy court should apply collateral estoppel to a state court judgment that Narinder Sangha ("Defendant") argues was wrongly decided. Under applicable California state law, even considering exceptions for public policy, extrinsic fraud, and other equitable reasons, the Court finds that the circumstances of this case, bankruptcy law, and California state law, dictate that this Court respect the state court judgment and apply collateral estoppel. As set forth below, after having previously found on summary judgment that collateral estoppel applies to the malicious element of § 523(a)(6), now, after trial, the Court determines that Plaintiff has also established the willful element of § 523(a)(6), and thus finds in favor of Plaintiff.

*II.       Factual Background*

On or about March 12, 2008, Plaintiff applied for a position with the City of San Jose as a firefighter. Subsequently in 2008, Plaintiff began a romantic relationship with Defendant, a relationship that lasted into early 2009, before deteriorating and ending amidst mutual allegations of wrongdoing.

In May 2009, Plaintiff advanced in the application process with the City of San Jose Fire Department ("Fire Department"), and the Fire Department commenced a background

investigation into Plaintiff's suitability to be a firefighter. In July 2009, Defendant filed for a restraining order against Plaintiff. After Defendant filed for a restraining order, but before the initial hearing, Plaintiff received a conditional offer of employment from the Fire Department. On August 12, 2009, a restraining order of six months was issued against Plaintiff. On August 21, 2009, Defendant was interviewed as part of Plaintiff's pending background investigation. On September 4, 2009, the Fire Department withdrew its conditional offer of employment, stating that Plaintiff "did not successfully pass the psychological screening portion of the recruitment process." On September 15, 2009, Plaintiff appealed the withdrawal of the conditional offer of employment. On October 1, 2009, the Civil Service Commission heard and denied Plaintiff's appeal.

### III.    Procedural History

On October 13, 2009, Plaintiff filed a complaint against Defendant for defamation (slander per se)[1] in San Francisco Superior Court ("State Court"), alleging that Defendant had made false statements about Plaintiff in the course of the employment background investigation. On November 17, 2009, Defendant filed an answer and general denial. The State Court granted Plaintiff leave to file a second amended complaint on February 14, 2011. In the second amended complaint, all fourteen causes of action alleged that Defendant made defamatory statements with malice and the prayer sought an award of exemplary/punitive damages.

---

[1] Throughout this opinion, the Court will use "defamation" and "slander" interchangeably to refer to the basis of Plaintiff's claim.

On March 4, 2011, Plaintiff filed a motion for terminating sanctions against Defendant for engaging in discovery abuses. The State Court granted Plaintiff's motion for terminating sanctions and struck Defendant's answer to the second amended complaint, commenting: "The Court finds that Defendant's failure to respond to the Court's orders compelling a response to interrogatory is willful." Defendant then dismissed his attorney Christopher Leuterio and filed a substitution of attorney showing Christopher N. Mandarano was to be his counsel. On April 8, 2011, Defendant terminated Mr. Mandarano, and substituted Robert D. Finkle as his attorney.

On April 18, 2011, the State Court entered default against Defendant. It conducted a prove-up hearing on Plaintiff's motion for entry of default judgment on June 2, 2011, and entered a judgment the same day awarding Plaintiff $1,369,633.40, comprised of $1,000,000 for general damages[2], $368,535.40 for "Special/Punitive Damages,"[3] and $1,098.00 for costs (the "Judgment").

On November 14, 2011, the State Court denied Defendant's motion to vacate the Judgment. Defendant did not appeal the Judgment.

Defendant filed a Chapter 7 bankruptcy petition on April 18, 2013. In his schedules, he listed a disputed debt owed to Plaintiff in the amount of $1,369,634.00 for the Judgment. Plaintiff subsequently filed a proof of claim for a secured claim in the amount of $1,627,049.43 ("Claim 1").

---

[2] This damage amount was generally for emotional distress, medical problems, and injury to reputation.
[3] This damage amount included $180,435 in lost wages, $6,000 in punitive damages, and the remainder for lost future wages and costs of appealing the employment decision.

On April 25, 2013, Plaintiff filed an adversary complaint against Defendant seeking to have

Claim 1 held to be non-dischargeable under 11 U.S.C. § 523(a)(6). Defendant filed an answer on

May 22, 2013. After Plaintiff filed a motion to strike all affirmative defenses that was granted in

part and denied in part with leave to amend, Defendant filed an amended answer on August 21,

2013, generally denying the complaint's allegations and stating three affirmative defenses: (1)

that the purported false statements were privileged; (2) that Plaintiff had engaged in fraud by

concealment of material facts from the State Court; and (3) that Plaintiff had unclean hands. On

October 18, 2013, the parties conducted a mediation conference that did not result in settlement.

Subsequent to this mediation conference, the discovery process between the parties began to

break down, leading to a variety of discovery litigation. A second mediation conference on

February 27, 2014, was also unsuccessful.

Plaintiff filed a motion for summary judgment on April 25, 2014, arguing that there were no

disputed material facts and that the Judgment was preclusive as to all the elements required for a

non-dischargeability judgment under 11 U.S.C. § 523(a)(6). Responding to the summary

judgment motion on June 4, 2014, Defendant asserted that triable issues of fact remained and

that Defendant was entitled to conduct additional discovery. Plaintiff filed a reply on June 12,

2014.

After argument by the parties at the hearing, the Court granted Plaintiff's motion for summary

judgment, finding, among other things, that:

1) There was no genuine dispute that the Judgment included $6,000 in punitive damages;
2) All elements of collateral estoppel were satisfied;
3) None of Defendant's arguments supported the extrinsic fraud exception to collateral estoppel;
4) Defendant had not provided a cognizable argument for "splitting up the damages in the State Court Judgment based on Defendant's conduct"; and
5) Defendant was seeking additional discovery to simply relitigate the State Court findings.

On August 7, 2014, the Court entered: (1) an order granting Plaintiff's motion for summary judgment [Dkt. No. 149]; and (2) a judgment holding the Judgment to be non-dischargeable under 11 U.S.C. § 523(a)(6) [Dkt. No. 150] (collectively, the "2014 Judgment").

Defendant filed an appeal of the 2014 Judgment on August 18, 2014. On June 11, 2015, the Bankruptcy Appellate Panel for the Ninth Circuit Court of Appeals (the "BAP") issued a decision vacating the 2014 Judgment and remanding the matter for further proceedings. The BAP decision was subsequently appealed to the Ninth Circuit Court of Appeals. On March 10, 2017, the Ninth Circuit issued a decision affirming the BAP and directing the Court to re-evaluate the availability of collateral estoppel in light of *In re Plyam*, 530 B.R. 456 (B.A.P. 9th Cir. 2015), which was decided by the BAP subsequent to the issuance of the 2014 Judgment. The Ninth Circuit further directed that:

> [T]he bankruptcy court must consider whether the state court default judgment and the allegations in Schrader's second amended complaint preclude relitigation of § 523(a)(6)'s "willful" intent requirement. If the bankruptcy court determines that the allegations in the second amended complaint together with the punitive damage award preclude relitigation of § 523(a)(6)'s "willful and malicious" intent requirements, then the California state trial court default judgment in favor of Schrader is not dischargeable.

*In re Sangha*, 678 F. App'x 561, 562 (9th Cir. 2017).

The mandate of the Ninth Circuit Court of Appeals to this Court was docketed on March 23, 2017. On April 5, 2017, the Court held a status conference to discuss with the parties the need for briefing to address the Ninth Circuit's determination that application of collateral estoppel must be evaluated in light of *Plyam*.  At the status conference, the Court directed the parties to file supplemental briefs; the parties ultimately filed a variety of supplemental pleadings.

The Court took the matter under submission on December 19, 2017. On June 12, 2018, after further supplemental pleadings were filed, the Court took the matter off submission, setting the matter for hearing. On October 10, 2018, the Court issued an oral ruling in Plaintiff's favor, and indicated it would enter a written opinion. On March 15, 2019, as docket number 277, the Court issued an opinion (the "Opinion"), revising its earlier position in the 2014 Judgment and granting Plaintiff's motion for summary judgment as to the maliciousness prong while denying the motion as to the willfulness prong. The Court also set a status conference for April 17, 2019.

At the status conference, Defendant indicated that he wanted to file a motion to reopen discovery. At a hearing on May 22, 2019, because the parties had never complied with the Court's instructions to lodge a scheduling order containing discovery deadlines, the Court issued a scheduling order setting a discovery deadline of July 31, 2019, and a pretrial motion deadline of August 23, 2019.

On June 28, 2019, Defendant filed a motion seeking an extension of the discovery deadline, which the Court denied on July 16, 2019. On July 30, 2019, Defendant filed a second motion to extend discovery, and Plaintiff responded by filing a motion for a protective order the following day, seeking to block the discovery sought by Defendant on the City of San Jose. The Court ultimately denied the motion for a protective order and extended the discovery deadline to the extent of allowing responses to any discovery propounded by the discovery deadline [Dkt. No. 323].

During October 2019, Defendant filed a: (1) motion for sanctions against Plaintiff seeking terminating sanctions for bad faith discovery conduct; and (2) motion to reconsider the Opinion. The Court denied both motions.

On March 11, 2020, Plaintiff began litigating the scope of Defendant's permitted defense by filing a motion in limine seeking to preclude evidence related to the privileged nature of the communications. On March 31, 2020, Defendant sought to amend his answer to plead the additional defenses of constitutionally protected speech and truthfulness. Both of these motions were denied.[4]

---

[4] The final three sentences of the Court's tentative ruling on Defendant's motion for leave to amend his answer read as follows: "After the Court entered the Opinion, the only remaining issue in this adversary is the issue of willfulness. As a result, Defendant's argument that its affirmative defenses do not need to apply to specific elements of § 523(a)(6) simply does not make sense. *See, e.g.*, *In re Gergely*, 110 F.3d 1448, 1454 (9th Cir. 1997) (state law affirmative defense is irrelevant after debt has been established). Because Plaintiff would not be precluded from establishing the element of willfulness even if Defendant successfully established its affirmative defenses of truth and privilege, the proffered "affirmative defenses" are not actually affirmative defenses to this action."

On April 23, 2020, Plaintiff filed a motion in limine for failure to provide initial disclosures and timely respond or update interrogatories. On June 24, 2020, the Court issued an order granting the motion to the extent of precluding any evidence "other than what could be reasonably anticipated to be offered in support of the affirmative defenses pled" [Docket No. 379]. On July 8, 2020, Plaintiff filed a motion for partial summary adjudication on Defendant's affirmative defenses. On October 15, 2020, the Court entered an order granting the motion, finding that the affirmative defenses pled by Defendant were barred by collateral estoppel.

On November 10, 2020, Plaintiff filed an additional motion in limine, seeking to preclude the testimony of witnesses who were not timely disclosed. On January 19, 2021, the Court granted the motion, precluding the testimony of Randy Wissel, James Sutherland, Mark Rappaport, Robert Burns, and Clem Jones. On March 3, 2021, Plaintiff filed another motion in limine, this time seeking to preclude the admission of a variety of exhibits. Plaintiff also filed a motion for default judgment in March 2021 on the grounds that Defendant had stopped actively participating in the case, although the motion was ultimately withdrawn.[5] On May 26, 2021, the Court issued an oral ruling precluding Defendant from admitting Exhibits I, J, HH, II, and JJ, although no proposed order was ever lodged with the Court.

On June 14, 2021, the Court issued a pre-trial order. On August 3, 2021, Defendant filed a motion seeking reconsideration of the order precluding the admission of Exhibits I, J, HH, II, and JJ (which included, in particular, the transcript of Plaintiff's appeal hearing before the Civil

---

[5] During this time, the parties were also engaged in a dispute in state court related to the issuance and violation of a restraining order. On March 29, 2021, the Court was forced to seal and strike explicit photos filed with the Court by Defendant. The parties also filed a variety of unauthorized, miscellaneous documents.

Service Commission on October 1, 2009). On August 10 and 11, the parties filed their trial

briefs. The Court held two days of trial on August 24 and 25. The Court orally granted

Defendant's motion for reconsideration in part, allowing the admission of Exhibits II and JJ. At

the conclusion of the second day of trial, the Court informed the parties that it would entertain

motions to reconsider the Opinion.

The Court conducted two days of trial in the above-proceeding on August 24 and 25, 2021.

Based upon the request of the parties, the Court permitted each party to file a motion to

reconsider the Opinion. Both parties filed motions to reconsider on September 21, 2021. On

November 8, 2021, the Court sent a copy of its detailed tentative ruling to the parties, providing

the parties an opportunity to file a written response to the tentative ruling prior to the hearing.

Both parties filed their response on November 22, 2021. On December 6, 2021, the Court orally

denied both motions; memorandum opinions to that effect were entered on March 31, 2022.

On December 13, 2021, the Court issue an order permitting Defendant to file a pleading

regarding a potential "just cause or excuse" defense. The Court's order noted that:

> "Just cause or excuse" is not an affirmative defense to a cause of action for
> slander *per se*; rather, it is an affirmative defense to a cause of action under §
> 523(a)(6). As such, it is not possible that "just cause or excuse" could have been
> actually litigated in the state court proceeding. Because the defense could not
> have been litigated in state court, collateral estoppel does not apply to bar the
> defense in this proceeding.

[Dkt. No. 546, pg. 3]. Defendant, however, did not file a pleading regarding "just cause or

excuse."

On January 24, 2022, the Court conducted a third and final day of trial. After the conclusion of

trial, the Court permitted the parties an opportunity to file post-trial briefs. Defendant filed a

post-trial brief on February 22, 2022. Plaintiff did not file a post-trial brief. This memorandum

follows.


The Court notes that during the entirety of these proceedings Plaintiff has proceeded *pro se*.

Defendant, on the other hand, has had the following representation during the bankruptcy case

(in addition to state court counsel):


- Denise Tessier represented Defendant from the filing of the answer until July 7, 2017. Deepalie Joshi, however, represented Defendant during his appeal
- On July 7, 2017, Ryan Thomas substituted in as Defendant's counsel
- On May 15, 2019, Ryan Thomas substituted out, leaving Defendant *pro se*
- On July 11, 2019, Defendant retained Donald Reid & Charity Manee
- On November 20, 2019, Donald Reid withdrew from the case
- On September 15, 2020, Charity Manee withdrew from the case, leaving Defendant *pro se*
- On July 27, 2021, Donald Reid returned to represent Defendant


*IV.      Jurisdiction*


The Court has jurisdiction over this adversary proceeding under 28 U.S.C. 157(b)(2)(I) and §

1334.  Venue is proper in this judicial district.

*V.    Legal Analysis*

*A.    11 U.S.C. § 523(a)(6)*

The plaintiff carries the burden of proof in a non-dischargeability action by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 286-87 (1991).

Section 523(a)(6) provides that: "(a) A discharge under 727 ... of this title does not discharge an individual debtor from any debt—... (6) for willful and malicious injury by the debtor to another entity or to the property of another entity." Whether a particular debt is for a willful and malicious injury by the debtor to another or the property of another under § 523(a)(6) requires application of a two-pronged test to the conduct giving rise to the injury. In other words, the creditor must prove that the debtor's conduct in causing the injuries was both willful and malicious. *Barboza v. New Form, Inc.* (*In re Barboza*), 545 F.3d 702,711 (9th Cir. 2008) (citing *Carrillo v. Su* (*In re Su*), 290 F.3d 1140, 1146–47 (9th Cir. 2002) and requiring the application of a separate analysis of each prong of "willful" and "malicious").

*B.   Application of Collateral Estoppel*

While the Court has already ruled on the issue of whether collateral estoppel applies and that issue is no longer pending before the Court, for purposes of clarity, the Court incorporates herein the analysis and reasoning behind its previous rulings. Collateral estoppel can be applied in bankruptcy proceedings. *Grogan v. Garner*, 498 U.S. 279, 284 n.11 (1991) ("We now clarify

that collateral estoppel principles do indeed apply in discharge exception proceedings pursuant to

§ 523(a).”). “Under the Full Faith and Credit Act, 28 U.S.C. § 1738, the preclusive effect of a

state court judgment in a subsequent bankruptcy proceeding is determined by the preclusion law

of the estate in which the judgment was issued.” *In re Harmon*, 250 F.3d 1240, 1245 (9th Cir.

2001).


The Bankruptcy Appellate Panel has recently listed the threshold requirements for the

application of collateral estoppel:

> (1) the issue sought to be precluded from relitigation is identical to that
> decided in a former proceeding; (2) the issue was actually litigated in the
> former proceeding; (3) the issue was necessarily decided in the former
> proceeding; (4) the decision in the former proceeding is final and on the
> merits; and (5) the party against whom preclusion is sought was the same as,
> or in privity with, the party to the former proceeding.

*In re Plyam*, 530 B.R. 456, 462 (B.A.P. 9th Cir. 2015) (*citing Lucido v. Superior Ct.*, 51 Cal. 3d.

335, 341 (Cal. 1990); *see also In re Harmon*, 250 F.3d 1240, 1245 (9th Cir. 2001) (listing the

five factors). “If these threshold requirements are met, California courts will only apply issue

preclusion ‘if application of preclusion furthers the public policies underlying the doctrine.’” *In

re Janian*, 2019 WL 9243073 at *4 (Bankr. C.D. Cal. 2019) (*quoting In re Harmon*, 250 F.3d

1240, 1245 (9th Cir. 2001)). 760-610-0000 (Teresa)

*1. Ninth Circuit Mandate and Subsequent Attempts to Relitigate the Opinion*

Plaintiff's motion for summary judgment and the resulting 2014 Judgment entered by this Court

on August 7, 2014, found that collateral estoppel applies and that Plaintiff was entitled to

judgment under 11 U.S.C. § 523(a)(6). In support of the 2014 Judgment, the Court reached

several conclusions that Defendant has attempted to repeatedly re-litigate over the ensuing years.

For example, the 2014 Judgment contained the following analysis regarding the extrinsic fraud

exception:

> Here, none of Defendant's allegations support the extrinsic fraud exception to
> issue preclusion and Defendant does not ask the Court to apply the extrinsic fraud
> exception. Defendant's arguments regarding fraud attack the veracity of
> Plaintiff's allegations in the second amended complaint in the State Court and in
> the Complaint in the instant adversary proceeding. Defendant continues to argue
> that the allegations in Plaintiff's complaints were not true and that Defendant's
> statements were not the reason that Plaintiff's job offer was withdrawn. However,
> a "judgment will not be set aside because it is based upon perjured testimony or
> because material evidence is concealed or suppressed, that such fraud both as to
> the court and the party against whom judgment is rendered is not fraud extrinsic
> to the record for which relief may be had." *Hogan v. Hogan*, 131 Cal. App. 2d
> 281, 284 (Cal. App. 1st Dist. 1955). Moreover, these allegations if true would not
> invoke the extrinsic fraud exception to issue preclusion. . . .
>
> The extrinsic fraud exception is applicable where Defendant was unable to
> present his case because of Plaintiff's fraudulent conduct. While Defendant makes
> many allegations of Plaintiff's purported misconduct, none of these allegations,
> even if true, prevented Defendant from presenting his case or asserting his legal
> rights in the State Court Action. Therefore, as set forth above, the Court declines
> to apply the extrinsic fraud exception to issue preclusion.

[Dkt. No. 149, pgs. 13-14]. The 2014 Judgment also rejects several more arguments that

Defendant has attempted to repeatedly re-litigate subsequently. For example:

Defendant argues that this Court should not give preclusive effect to the State
Court Judgment because it would be inequitable to do so because Defendant's
actions did not directly cause harm to the Plaintiff. Specifically, Defendant argues
that Plaintiff lied to the State Court and lied to this Court because Plaintiff's job
offer was withdrawn because Plaintiff failed to pass the psychological screening
portion of the recruitment process.

[Dkt. No. 149, pg 11]. This argument was rejected as follows:

Defendant's primary argument that it would be inequitable to apply issue
preclusion is premised on the assertion that Plaintiff lied in the State Court and
has lied to this Court. Specifically, Defendant alleges that he recently discovered
the true reason that Plaintiff's job offer was withdrawn and Plaintiff was aware of
the true reason when he filed the State Court Action. Here, again, it appears that
Defendant is essentially trying to re-litigate the State Court Action, which is the
very thing that issue preclusion would prevent. Plaintiff's statements in the State
Court Action and the Complaint are merely allegations. As set forth above,
Defendant had a full and fair opportunity to determine the veracity and disprove
the allegations in the Plaintiff's complaint in the State Court, but failed to do so.
To the extent that Defendant is arguing that the Court should decline to apply
issue preclusion because of the "newly discovered evidence" (the letter
withdrawing Plaintiff's conditional offer of employment), such argument is
unpersuasive.

[Dkt. No. 149, pg. 17].


As set forth above, Defendant offered extensive argumentation relating to why the Court should

decline to apply collateral estoppel, and all of the arguments were rejected by the Court when the

Court entered the 2014 Judgment.


The 2014 Judgment was appealed to the Bankruptcy Appellate Panel for the Ninth Circuit., and,

subsequently, to the Ninth Circuit Court of Appeals. The Ninth Circuit's instructions to the Court

ended by stating:


Accordingly, the bankruptcy court must consider whether the state court default
judgment and the allegations in Schrader's second amended complaint preclude

relitigation of § 523(a)(6)'s "willful" intent requirement. If the bankruptcy court determines that the allegations in the second amended complaint together with the punitive damage award preclude relitigation of § 523(a)(6)'s "willful and malicious" intent requirements, then the California state trial court default judgment in favor of Schrader is not dischargeable.

*In re Sangha*, 678 F 3d. Appx. 561, 562 (9th Cir. 2017).  The Ninth Circuit's mandate to this Court was clear and simple – resolve the "intent" element in § 523(a)(6). Yet, Defendant has devoted the bulk of his efforts to attempt to escape from the application of collateral estoppel – a litigation strategy that appears improper given the mandate from the Ninth Circuit. As a result of the mandate from the Ninth Circuit, Defendant may be precluded from raising an argument that collateral estoppel does not apply.

Nevertheless, the Court has subsequently, explicitly or implicitly, entertained Defendant's attempts to avoid the application of collateral estoppel, and has repeatedly issued rulings indicating that the application of collateral estoppel is appropriate. After the Ninth Circuit issued its mandate:

- The Court entered the Opinion granting in part and denying in part Plaintiff's motion for summary judgment. The Opinion found that, after applying collateral estoppel to the Judgment, the issue of maliciousness was resolved in Plaintiff's favor, but the issue of willfulness was not resolved. [Dkt. No. 277].[6]

---

[6] The Opinion also contains the following conclusion highly relevant to Defendant's repeated attempt to relitigate the truthfulness of the statements at issue: "First, in rendering default judgment in Schrader's favor, the State Court necessarily found that Sangha published false and unprivileged statements about Schrader because the sole claims asserted by Schrader in the second amended complaint were for Slander Per Se pursuant to California Civil Code § 46. *Gottlieb v. Kest*, 141 Cal. App. 4th 110, 149 (2006) ("Default judgment conclusively establishes, between the parties so far as subsequent proceedings on a different cause of action are concerned, the truth of all material allegations contained in the complaint in the first action, and every fact necessary to uphold the default judgment; but such judgment is not conclusive as to any defense or issue which was not raised and is not necessary to uphold the judgment."). Second, the material allegations underpinning the State Court Judgment are that Sangha published false statements regarding verbal, physical, and emotional abuse by Schrader. *In re Sangha*, *1 n.3. Thus, the truth of these material allegations was established when the State Court rendered its default judgment in favor of Schrader and this Court must accept that the State Court necessarily decided that Sangha uttered falsehoods about Schrader

- Subsequently, more than seven months later, the Court heard Defendant's motion to reconsider the Opinion. Defendant argued that applying collateral estoppel to the Judgment was legal error, and the Court denied the motion pursuant to order entered December 16, 2019.
- In March 2020, Defendant sought leave to amend his answer to include additional defenses – including a defense that the statements he said were "true," a factual assertion inconsistent with the Judgment. The Court, finding that the proposed defenses were not actually "defenses" to the remaining legal issue, but were instead an attempt to relitigate the Judgment, the Court denied the motion pursuant to order entered May 18, 2020.
- After holding two days of trial, the Court offered both parties an opportunity to file motions to reconsider the Opinion. Both motions were denied pursuant to opinions entered on March 31, 2022.[7]

Pursuant to the Opinion, the Court has already ruled in Plaintiff's favor on the maliciousness prong by applying collateral estoppel. Therefore, the sole issue remaining is the willfulness prong. The Court has already provided detailed legal analysis in its order entered March 31, 2022, as docket number 556, which is incorporated herein by reference. Nevertheless, in sections V.B.2-4, *infra*, the Court sets forth that analysis again, with minor revisions and elaborations. The Court finds that restatement of this analysis is appropriate given that the trial approach adopted by Defendant did not incorporate or acknowledge much of this analysis.[8]

---

that were of an incredible inflammatory nature. *See Gottlieb v. Kest*, 141 Cal. App. 4th at 149. The collateral estoppel effect of the State Court Judgment precludes Sangha from challenging any of the material factual issues that were both raised in Schrader's State Court pleadings and which were necessary to uphold the judgment. *See In re Moore*, 186 B.R. 962, 972 (Bankr. N.D. Cal. 1995). In sum, the limits of what was necessarily decided by the State Court are that Sangha uttered falsehoods and that those falsehoods were stated with a degree of malice."

[7] While these opinions were not entered until trial had concluded, prior to the close of trial both parties were provided with "tentative rulings" that did not materially differ from the ultimate opinions.

[8] The section is written in the present tense despite the fact that the argumentation was raised in a motion to reconsider rather than in the trial brief. While the Court had sent its tentative ruling to the parties and orally ruled on the motion to consider more than one month prior to the conclusion of trial, the written opinion was not entered until after trial.

*2.   Public Policy Exception to Application of Collateral Estoppel*

Here, the only collateral estoppel element contested is the public policy test. In 1990, the

California Supreme Court wrote that:

> Even assuming all the threshold requirements are satisfied, however, our analysis
> is not at an end. We have repeatedly looked to the public policies underlying the
> doctrine before concluding that collateral estoppel should be applied in a
> particular setting. As the United States Supreme Court has stated, the rule of
> collateral estoppel in criminal cases is not to be applied with the hypertechnical
> and archaic approach of a nineteenth century pleading book, but with realism and
> rationality. Accordingly, the public policies underlying collateral estoppel –
> preservation of the integrity of the judicial system, promotion of judicial
> economy, and protection of litigants from harassment by vexatious litigation –
> strongly influence whether its application in a particular circumstance would be
> fair to the parties and constitute sound judicial policy.

*Lucido v. Superior Ct.*, 51 Cal. 3d 335, 342-43 (Cal. 1990) (quotations and citations omitted); *see

also In re Baldwin*, 249 F.3d 912, 919 (9th Cir. 2001) ("The California Supreme Court has

identified three policies underlying the doctrine of collateral estoppel: 'preservation of the

integrity of the judicial system, promotion of judicial economy, and protection of litigants from

harassment by vexatious litigation.'").

Analysis of these factors is often conducted in a relatively summary fashion and, assuming the

threshold requirements are met, courts generally conclude that public policy considerations

weigh in favor of the application of collateral estoppel. For instance, the Ninth Circuit, dealing

with a state court default judgment that arose after the debtor stopped participating during the

pendency of the state court litigation, conducted its analysis as follows:

With regard to the integrity of the judicial system, the California Supreme Court directs us to inquire whether eliminating the possibility of inconsistent verdicts – which would follow from the application of collateral estoppel – would undermine or enhance the public's confidence in the judicial system. Where, as here, the state court was fully capable of adjudicating the issue subsequently presented to the bankruptcy court, we conclude that the public's confidence in the state judicial system would be undermined should the bankruptcy court relitigate the question of whether Baldwin had acted with the intent to injure Kilpatrick. Moreover, relitigation in bankruptcy court of the issue decided by the state court would conflict with the principle of federalism that underlies the Full Faith and Credit Act.

Turning to the second policy, it is obvious that application of collateral estoppel in the present context will promote judicial economy. If Baldwin were not precluded from relitigating the issue, the bankruptcy court would have to conduct an evidentiary hearing in order to determine whether Baldwin intentionally acted to injure Kilpatrick. Relying on the state court's determination allows the bankruptcy court to conserve judicial resources.

Finally, we conclude that under these circumstances, application of collateral estoppel will protect creditors from vexatious litigation. Baldwin had a full and fair opportunity to litigate the issue in the state court proceedings. There is no indication in the record that those proceedings violated Baldwin's right to due process, nor does Baldwin allege any constitutional infirmity. Baldwin forfeited his right to defend himself in state court. He presents no good reason for having done so. It would be unfair to Kilpatrick to require him to relitigate before the bankruptcy court what was properly decided by the state court.

*In re Baldwin*, 249 F.3d 912, 920 (9th Cir. 2001). The framework laid out by the Ninth Circuit, and the factors recited by *Lucido* above, would appear to indicate that there is a presumption that policy considerations weigh in favor of the application of collateral estoppel when, as is the case here, the underlying judgment was issued by a state court. Specifically, in that circumstance, declining to apply collateral estoppel would: (a) seem to rarely further judicial integrity; (b) never improve judicial economy; and (c) never affirmatively protect litigants from "vexatious" litigation. An example of a court finding that none of the *Lucido* factors were satisfied is found in *Vandenberg v. Superior Ct.*:

As noted above, the primary purposes of collateral estoppel are to preserve the integrity of the judicial system, promote judicial economy, and protect litigants from harassment by vexatious litigation. But because a private arbitrator's award is *outside* the judicial system, denying the award collateral estoppel effect has no adverse impact on judicial integrity. Moreover, because private arbitration does not involve the use of a judge and a courtroom, later relitigation does not undermine judicial economy by requiring duplication of judicial resources to decide the same issue. Finally, when collateral estoppel is invoked by a *nonparty* to the private arbitration, the doctrine does not serve the policy against harassment by vexatious litigation. In such cases, the doctrine is asserted not to protect one who has already once prevailed against the same opponent on the same cause of action, but simply to gain vicarious advantage from a litigation victory *won by another*.

21 Cal. 4th 815, 833 (Cal. 1999) (quotation and citation omitted); *see also In re Khabushani*, 2021 WL 2562111 at *9 (B.A.P. 9th Cir. 2021) ("In *Vandenberg v. Superior Court*, the California Supreme Court held that in deciding whether there is 'fairness and sound public policy,' courts consider the judicial nature of the prior forum, i.e., its legal formality, the scope of its jurisdiction, and its procedural safeguards, particularly including the opportunity for judicial review of adverse rulings."). Only in unique cases -- where the findings were made by a quasi-judicial forum (negating factors (a) and (b)), or where a non-party to the original proceeding seeks to utilize collateral estoppel (negating factor (c)) -- does it appear that public policy considerations would weigh against application of collateral estoppel. As this analysis, and the subsequent excerpt, make clear, the Court cannot decline to apply collateral estoppel simply because of questions regarding the merits of the underlying judgment:

The bankruptcy court's role was not to evaluate the state court's decision, but merely to determine whether Samuels was precluded from relitigating an issue that had already been determined. Moreover, there is no indication that it is within a bankruptcy court's discretion to decline to apply collateral estoppel simply because the state court's analysis was lacking. While certain public policies may limit applicability of collateral estoppel in California, the flawed nature of the prior decision is not one of them.

*In re Samuels*, 2008 WL 1751745 at \*2 (9th Cir. 2008) (quotation omitted).[9] [10]

Therefore, given the reasoning and caselaw outlined above, the Court concludes that each of the public policy considerations weigh in favor of application of collateral estoppel here, for the same reasons as articulated in *In re Baldwin*. Specifically, first, relitigating an issue that the State Court was fully capable of adjudicating would undermine the integrity of the judicial system. Second, relitigating the issues resolved in State Court would require additional judicial resources and, therefore, would not promote judicial economy. Finally, Defendant had a "full and fair opportunity to litigate the issue in the state court proceedings. There is no indication in the record that those proceedings violated [Defendant's] right to due process, nor does [Defendant] allege any constitutional infirmity." *In re Baldwin*, 249 F.3d 912, 920 (9th Cir. 2001).

Furthermore, the Court rejects the contention that the Court has "broad discretion" to decline to apply collateral estoppel based on undefined equitable grounds. The Court disagrees with Defendant's contention that it can merely decline to apply collateral estoppel on some vague ground of "fairness."[11]  Defendant's argument ignored the public policy test articulated by the

---

[9] *See also In re Bugna*, 33 F.3d 1054, 1058 (9th Cir. 1994) ("The bankruptcy court's otherwise broad powers do not include the power to reject a party's invocation of collateral estoppel on an issue fully and fairly litigated in another court.").

[10] The Court notes that Civil Service Commission transcript is the primary piece of evidence Defendant relies upon to argue that the Judgment is legally erroneous. The Civil Service Commission records, however, only directly relate to a secondary component of the damages (see footnotes 2 and 3 and accompanying text).

[11] The Court does note that there is caselaw that contains statements related to "fairness" and "sound judicial policy." *See, e.g., Vandenberg v. Superior Court*, 21 Cal. 4th 815, 835 (Cal. 1999). But this language is derived from *Lucido*, which laid out a three-part test which is this Court's clearest instruction as to how to evaluate "fairness" and "sound judicial policy," stating that its test "strongly influences" whether [collateral estoppel's] application in a particular setting would be fair to the parties and constitute sound judicial policy. 51 Cal. 3d 335, 343 (Cal. 1990). The Court interprets *Lucido* in light of how the this its language has been applied by the Ninth Circuit Court of Appeals.

California Supreme Court and recited by the Ninth Circuit Court of Appeals, and is inconsistent

with the Ninth Circuit's conclusion in *In re Samuels* limiting consideration to certain public

policy factors and stating that: "[w]hile certain public policies may limit applicability of

collateral estoppel in California, the flawed nature of the prior decision is not one of them," 2008

WL 1751745 at *2 (9th Cir. 2008). Furthermore, Defendant has provided no caselaw that: (a)

would permit this Court to substitute its own, holistic test when considering public policy

considerations; or (b) suggests that the Court should, under the facts before it, reach the

conclusion that public policy considerations weigh against application of collateral estoppel.


Defendant's other arguments as to why collateral estoppel should not apply are: (1) Plaintiff

"perjured" himself to obtain the default judgment; and (2) one of Defendant's state court

attorneys committed malpractice/was negligent. The Court notes that in a tentative ruling

incorporated into an order entered on August 7, 2014, as docket number 149, the Court rejected

both arguments, provided detailed reasoning, and cited applicable caselaw. While Defendant

attaches this tentative ruling to his response filed as docket number 539, he does not lay out a

legal argument supported by caselaw contending that either: (1) the caselaw and legal standards

cited are incorrect; or (2) application of the caselaw and legal standards should result in a

different conclusion. Nevertheless, the Court once again will address the arguments.


        3.  *Extrinsic Fraud Exception to Application of Collateral Estoppel*


Defendant's first argument is that Plaintiff committed fraud in the State Court proceeding by

misrepresenting the reasons for the withdrawal of the employment offer.

In *In re Roark*, 2019 WL 3842998 (S.D. Cal. 2019), the Court was presented with a materially

similar situation: a party obtained a default judgment on a defamation cause of action in state

court after terminating sanctions were entered against the defendant based on discovery

misconduct. After the defendant filed bankruptcy, the plaintiff filed a non-dischargeability

complaint under 11 U.S.C. § 523(a)(6), and defendant argued that certain statements in the

declarations submitted to the state court were fraudulent. *Id*. The district court, in reviewing an

appeal of a bankruptcy court order granting summary judgment to plaintiff wrote: "Critically,

however, the bankruptcy court found *even if* Roark's allegations were true, and NIFCU did

present false statements to the state court, this constitute intrinsic fraud, which is not a grounds

for relief. . . . the Court finds no evidence warranting a different conclusion." *Id*. at *5.


As noted by the Court in *Roark*, the extrinsic fraud exception essentially requires that the fraud

deprive the opposing party of due process. *See id.* at *4 (extrinsic fraud occurs "when a party's

conduct prevents another party from presenting his or her claim in court"). Here, however, the

State Court ordered terminating sanctions based on Defendant's conduct during the proceedings.

"[U]pon entry of default, the allegations of the complaint were deemed true." *Curtis v.

Illumination Arts, Inc.*, 682 Fed. Appx. 604, 605 (9th Cir. 2017).  Defendant's line of argument,

that the truth of the allegations presented to the State Court should be considered by this Court,

would lead to the elimination of the application of the collateral estoppel doctrine to default

judgments, since it essentially affords a defendant a second opportunity to litigate the merits of

the allegations in the underlying dispute.

23

Defendant has challenged the correctness/applicability of the reasoning presented in *In re Roark*. Nevertheless, this reasoning finds support in a variety of caselaw. *See Cedars-Sinai Med. Ctr. v. Superior Court*, 18 Cal. 4th 1, 10 (Cal. 1998) ("This same concern underlies another line of cases that forbid direct or collateral attack on a judgment on the ground that evidence was falsified, concealed, or suppressed. After the time for seeking a new trial has expired and any appeals have been exhausted, a final judgment may not be directly attacked and set aside on the ground that evidence has been suppressed, concealed, or falsified; in the language of the cases, such fraud is 'intrinsic' rather than 'extrinsic.' *Similarly, under the doctrines or res judicata and collateral estoppel, a judgment may not be collaterally attacked on the ground that evidence was falsified or destroyed*.") (emphasis added) (citations omitted) (collecting California authority); *see also U.S. v. Throckmorton*, 98 U.S. 61, 68 (1878) ("We think these decisions establish the doctrine on which we decide the present case; namely, that the acts for which a court of equity will on account of fraud set aside or annul a judgment or decree, between the same parties, rendered by a court of competent jurisdiction, have relation to frauds, extrinsic or collateral, to the matter tried by the first court, and not to a fraud in the matter on which the decree was rendered.").

Pursuant to the clear and binding reasoning set forth by the California Supreme Court in *Cedars-Sinai Med. Ctr.*, the Court concludes that it must reject Defendant's argument that allegedly false statements made by Plaintiff in the state court proceeding provide a basis to decline to apply collateral estoppel. The Court also notes that Defendant did not provide any caselaw that would suggest the Court should reach a different conclusion.

Additionally, the Court notes that this reasoning and the applicable caselaw has been available to

Defendant (or his counsel) to research for years. In the 2014 Judgment, the Court set forth the

following:

> The party seeking to invoke extrinsic fraud must show: (1) the judgment was
> entered by default under circumstances which prevented him from presenting his
> case; and (2) these circumstances resulted from extrinsic fraud practiced by the
> other party or his attorney. The vital question is whether the successful party has
> by inequitable conduct, either direct or insidious in nature, lulled the other party
> into a state of false security, thus causing the latter to refrain from appearing court
> or asserting legal rights. Some examples of extrinsic fraud are: concealment of the
> existence of a community property asset, failure to give notice of the action to the
> other party, convincing the other party not to obtain counsel because the matter
> will not proceed (and it does proceed). . . .
>
> Here, none of Defendant's allegations support the extrinsic fraud exception to
> issue preclusion and Defendant does not ask the Court to apply the extrinsic fraud
> exception. Defendant's arguments regarding fraud attack the veracity of
> Plaintiff's allegations in the second amended complaint in the State Court Action
> and in the Complaint in the instant adversary proceeding. Defendant continues to
> argue that the allegations in Plaintiff's complaints were not true and that
> Defendant's statements were not the reason that Plaintiff's job offer was
> withdrawn. Defendant also alleges that Plaintiff knew the true reason his job offer
> was withdrawn. However, a judgment will not be set aside because it is based
> upon perjured testimony or because material evidence is concealed or suppressed,
> that such fraud both as to the court and the party against whom judgment is
> rendered is not fraud extrinsic to the record for which relief may be had."
> Moreover, these allegations if true would not invoke the extrinsic fraud exception
> to issue preclusion. . . .
>
> The extrinsic fraud exception is applicable where Defendant was unable to
> present his case because of Plaintiff's fraudulent conduct. While Defendant makes
> many allegations of Plaintiff's purported misconduct, none of these allegations,
> even if true, prevented Defendant from presenting his case or asserting his legal
> rights in the State Court Action.

[Dkt. No. 149] (citations and quotations omitted). As outlined above, Defendant is making the

same argument made over seven years ago, and rejected by this Court, without making a genuine

1

2

attempt to provide legal analysis or supporting caselaw warranting a change in the Court's

conclusion.

3

4

*4.  Malpractice of Defendant's Counsel in State Court Proceedings*

5

6

7

Defendant asserts that he was denied a full and fair opportunity to litigate due to the malpractice

8

and/or negligence of his attorney. Defendant relies upon *Smith v. ExxonMobil Oil Corp.*, 153

9

Cal. App. 4th 1407 (Cal. Ct. App. 2007) in support of his argument. The Court agrees that, if

10

Defendant was "denied a full and fair opportunity" to litigate in State Court, then such a

11

conclusion would lead this Court to conclude that the application of collateral estoppel was not

12

appropriate.

13

14

15

The Court does not agree, however, that Defendant was denied a full and fair opportunity to

16

litigate. As pointed out by the Court during the hearing on December 6, 2021, the holding of

17

*Exxon Mobil Oil* rested on the conclusion that "neither Mobile *nor its counsel* were in any way

18

responsible for Dr. Weir's unavailability." *Id*. at 1420 (emphasis added). Here, Defendant's

19

argument is that malpractice/negligence by state court counsel is the cause of his denial of a "full

20

and fair opportunity to litigate." Defendant has not pointed to any caselaw that concluded the

21

negligence or malpractice of counsel was a basis to decline to apply collateral estoppel.

22

23

24

While caselaw on the issue is not extensive, the caselaw supports the Court's conclusion that

25

malpractice or negligence on the part of Defendant's state court counsel generally is not a basis

26

to decline to apply collateral estoppel. *See, e.g.*, *Arunachalam v. Fremont Bancorporation*, 2015

27

28

WL 12806552 at *2 (N.D. Cal. 2015) ("Plaintiff's only other argument as to why collateral

estoppel does not apply is that Pi-Net did not have a full and fair opportunity to litigate the *JP*

*Morgan* and *Fulton* cases because it was deprived of crucial evidence and witnesses by a rogue

former attorney who is subject to an ongoing malpractice suit by Plaintiff. Plaintiff cites no

evidence in support of this contention. *Furthermore, the remedy for malpractice is damages, not*

*an invalidation of the prior judgment*.) (emphasis added) (citations omitted); *In re Gessin*, 2013

WL 829095 at *6-7 (B.A.P. 9th Cir. 2013) (determining whether attorney negligence deprived

party of "full and fair opportunity to litigate); *In re Rounds*, 2010 Bankr. Lexis 6521 at *34, n.6

(Bankr. D. Colo. 2010) ("Both cases hold that attorney malpractice is no bar to the application of

collateral estoppel for two reasons. Parties are bound by the actions of their agents (e.g.

attorneys), against whom a separate remedy for malpractice exists. Furthermore, it would be

unfair to burden a party, successful in a prior suit, with the necessity of relitigating issues already

decided due to negligence on the part of the losing party's attorney."); *In re Williams*, 282 B.R.

267 (Bankr. N.D. Ga. 2002) ("The Debtor claims that he was denied a full and fair opportunity to

litigate because his attorney committed malpractice. However, an attorney's malpractice is not a

per se denial of a full and fair opportunity to litigate.").


As the discussion in *Gessin* indicates, there may be some circumstances when attorney

negligence does deprive a litigant of a "full and fair opportunity to litigate." Here, Defendant has

not articulated any argument as to *when* attorney malpractice/negligence results in a finding that

a "full and fair opportunity to litigate" was denied, nor has Defendant articulated *how*

Defendant's attorney negligence denied him a "full and fair opportunity to litigate," instead

appearing to assume that malpractice requires such a conclusion when the caselaw is not in

accord. On the contrary, the State Court order granting terminating sanctions against Defendant states that "[t]he Court finds that Defendant's failure to respond to the Court's orders compelling a response to interrogatory is willful." [Dkt. No. 87, pg. 88].

Additionally, the Court notes that Defendant has employed numerous attorneys, and has engaged in extensive motion practice, both in this proceeding and in State Court, attempting to remedy the Judgment. Just as with Defendant's argument that alleged perjury/fraud on the court should preclude collateral estoppel being applied to the Judgment, Defendant's argument regarding attorney negligence/malpractice has previously been addressed by the Court in the 2014 Judgment. To wit:

> Attorney's malpractice is not per se denial of a full and fair opportunity to litigate; the inquiry is whether the party had adequate notice of the issue and was afforded the opportunity to participate in its determination. . . .
>
> Here, the undisputed facts establish that Defendant was given due process and had a full and fair opportunity to litigate the State Court Action. Defendant retained three different sets of counsel to represent him in the State Court Action. He answered the complaint, requested a fee waiver, and appeared at a fee waiver hearing. The record also reflects that Defendant's second attorney, Christopher Mandarano was substituted in as counsel for Defendant prior to Plaintiff filing his Motion for Default Judgment in the State Court Action and represented Defendant [ ] in connection with filing the Motion to Vacate the Entry of Default. . . . Defendant hired three different attorneys to represent him during the State Court Action, and filed a Motion to vacate entry of the State Court Judgment. . . . Moreover, any argument that Defendant did not have a full and fair opportunity due to his first attorney's negligence is not persuasive.

[Dkt. No. 149] (citations and quotations omitted).

28

*C.  The Relationship Between the Standards for Slander Per Se, Willfulness, and*

*Maliciousness*

The basis for a claim of slander *per se* in California is CAL. CIV. CODE § 46, reproduced below:

> Slander is a false and unprivileged publication, orally uttered, and also communications by radio or any mechanical or other means which:
>
> 1. Charges any person with crime, or with having been indicted, convicted, or punished for crime;
> 2. Imputes in him the present existence of an infectious, contagious, or loathsome disease;
> 3. Tends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits;
> 4. Imputes to him impotence or a want of chastity; or
> 5. Which, by natural consequence, causes actual damage.

In analyzing willfulness, the Court is guided by the Supreme Court's analysis in *Kawaauhau v. Geiger*, 523 U.S. 57 (1998). In rejecting the argument that negligent or reckless torts are sufficient for a willfulness finding under § 523(a)(6), the Supreme Court reasoned: "[A]s the Eighth Circuit observed, the (a)(6) formulation triggers in the lawyer's mind the category 'intentional torts,' as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend 'the consequences of an act,' not simply 'the act itself.'" *Id.* at 61-62 (emphasis omitted) (*quoting* RESTATEMENT (SECOND) OF TORTS § 8A, cmt. a). The RESTATEMENT (SECOND) OF TORTS §8A, quoted by the Supreme Court, contains the following commentary delineating what makes a tort intentional:

    a.   "Intent," as it is used throughout the Restatement of Torts, has reference to the consequences of an act rather than the act itself. When an actor fires a gun in the midst of the Mojave Desert, he intends to pull the trigger; but when the bullet hits a person who is present in the desert without the actor's knowledge, he does not intend that result. "Intent" is limited, wherever it is used, to the consequences of the act.

    b.   All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his act, and still goes ahead, he is treated by the law as if he had in fact desired to produce the result. As the probability that the consequences will follow decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness, as defined in § 500. As the probability decreases further, and amounts only to a risk that the result will follow it becomes ordinary negligence, as defined in § 282. All three have their important place in the law of torts, but the liability attached to them will differ.

As such, according to the Restatement, a tort is "intentional" if the tortfeasor: (a) intended the consequences of the act; or (b) knew that the consequences were substantially certain to occur. After *Kawaauhau*, the willfulness standard universally applied has mirrored the definition of an intentional tort recited above. *See, e.g.*, *In re Su*, 290 F.3d 1140, 1143 (9th Cir. 2002). Therefore, any tort that is an intentional tort under the Restatement's definition of that term would satisfy the willfulness test. *See, e.g.*, *In re Luebbert*, 987 F.3d 771, 784 (8th Cir. 2021) ("It is enough to show that conduct amounting to an intentional tort accompanied the breach of contract for a creditor to meet the willful injury requirement of § 523(a)(6)."); *In re Jercich*, 238 F.3d 1202, 1208 (9th Cir. 2001) ("the willful injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict the injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct"); *In re Markowitz*, 190 F.3d 455, 464 (6th Cir. 1999) (deriving willfulness standard from Restatement of Torts definition of intentional tort).

But, however, not all torts that are characterized as "intentional" under state law necessarily

follow the definition of "intentional tort" outlined in the Restatement of Torts. *See, e.g.*, *First*

*Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 774 (7th Cir. 2013) ("Although *Geiger* refers to

intentional torts to help explain the federal standard, it does not hold that all state-law intentional

torts are 'willful' for purposes of section 523(a)(6)."); *In re Arden*, 2015 WL 4068962 at *10

(B.A.P. 9th Cir. 2015) ("Comparing the elements of the California intentional tort of malicious

prosecution with the requirements to establish a willful and malicious injury . . . we disagree that

the 'willful' standard was necessarily met."). This inconsistency in the use of the term

"intentional tort" has led to the following, seemingly paradoxical pronouncement from the Fifth

Circuit Court of Appeals: "the language of Section 523(a)(6) mirrors the definition of an

intentional tort . . . [d]espite similarities in the language used to describe an injury under Section

523(a)(6) and intentional torts, Section 523(a)(6) creates a narrower category of tortious

conduct." *In re Williams*, 337 F.3d 504, 508 (5th Cir. 2003).


This apparent contradiction is partially explained by the Fifth Circuit's previous analysis in

*Matter of Miller*, 156 F.3d 598, 603-04 (5th Cir. 1998). To wit:


> Merely because a tort is classified as intentional does not mean that any injury
> caused by the tortfeasor is willful. . . .
>
> Most often, an intentional tort requires either objective substantial certainty of
> harm or subjective motive to do harm. Indeed, the presence of one of these factors
> is both necessary and sufficient for a tort to be classified as an "intentional tort"
> under the traditional modern definition.
>
> Thus, rather than allow the general classification to be a talisman, we hearken
> back to this original definition of "intentional tort" to determine whether injury is
> "willful" for § 523(a)(6).

*Id*. at 604 (citations omitted). In other words, for an intentional tort to necessarily satisfy the

willfulness standard, it must be a "traditional modern" intentional tort, i.e. an "intentional tort"

under the Restatement standard.


In the context of slander *per se*, relating to a category of statements that are deemed to

necessarily cause harm to their subject, one could interpret the theoretical underpinnings as either

assigning or presuming the intent of the speaker, or one could conclude that the intent is

irrelevant, and, as such, the action is more akin to a strict liability tort. To help illustrate this

ambiguity, the Court now turns to a law review article cited by the Fifth Circuit Court of Appeals

in *In re Miller* -- Kenneth Vandevelde, *A History of Prima Facie Tort: The Origins of a General

Theory of Intentional Tort*, 19 HOF. L. REV. 447 (1990).


According to *The Origins of a General Theory of Intentional Tort*, the concept of intentional tort

was conceived by Oliver Wendell Holmes, who devised a scheme separating torts into three

categories: (1) intentional torts; (2) torts based on negligence; and (3) strict liability torts. *See id*.

at 448. At the time, the "classic" intentional torts (e.g., assault, battery, false imprisonment) were

considered strict liability torts. *See id*. at 450, 459. The category of intentional torts outlined by

Holmes, however, "was a grab-bag of miscellaneous torts which had developed out of the old

action on the case: deceit, slander and libel, malicious prosecution and conspiracy. He treated

each separately." *Id*. at 459. Regarding slander specifically, Holmes observed that

> Slander . . . often had been said to require malice, which suggested that actual intent to cause harm, if not malevolence, was required. Yet, he argued malice[12], in fact, was presumed upon the speaking of certain words, regardless of the speaker's state of mind.

*Id*. Vandevelde comments on Holmes' scheme as follows:

> In truth, Holmes' category of intentional torts was really not that at all. As Holmes knew, slander was really a strict liability tort because malice was presumed from certain conduct. . . .Holmes might well have simplified his scheme by dividing torts into those based on fault and those based on strict liability, without further subdividing the former category into intentional and negligent tort.

As noted above, earlier formulations of "intentional tort" predated the current Restatement's definition, and, as such, produced some caselaw and commentary that used the terms in a different matter. Additionally, the difficulty in positing a unified theory of torts resulted in the following:

> The ultimate triumph of Holmes' tripartite scheme was assured in 1934, when the American Law Institute adopted it for use in its *Restatement of the Law of Torts*. The first *Restatement* organized tort law into three divisions coinciding with Holmes' three categories: intentional harms to persons, land and chattels; negligence; and liability without fault.
>
> In the Institute's view, however, these three divisions did not exhaust the law of torts. The first *Restatement*, thus, contained additional divisions relating to

---

[12] Note that the article uses "intent" and "malice" as roughly synonymous terms, whereas, in the context of this non-dischargeability proceeding, malice has a different, defined meaning. *See id.* at 459 ("both malice and intent referred simply to foresight that a harm would occur"); *see also id.* at 461 ("Holmes had argued that malice, as used in criminal statutes, simply meant intent. It became his rhetorical device thereafter routinely to pair malice and intent as if essentially synonymous."). *But see id.* at 474 ("In *Privilege, Malice, and Intent*, Holmes in effect acknowledged that the presence of malice was relevant to the justification rather than the foreseeability element of intentional tort. Intent and negligence could be arranged along a continuum, but malice measured an entirely different dimension of the defendant's conduct.") and at 483 ("[W]illful injury 'would embrace all injuries intended to follow from the parties' acts, although they were intended only as the necessary means to ulterior gain for the parties themselves.' Malicious injury, on the other hand, meant 'doing a harm malevolently for the sake of the harm as an end in itself, and not merely as a means to some further end legitimately desired.").

defamation; deceit and malicious prosecution; harms to contract relations; harms
to domestic relations; and legal and equitable relief against tortfeasors.

Thus, in the foundational assortment of torts, defamation managed to find a place outside the
"comprehensive" scheme, neither placed with the intentional torts, nor with the negligent, nor
with those to which liability attaches regardless of the actor's state of mind.

This difficulty in categorizing and defining defamation has produced an analytical hesitancy in §
523(a)(6) actions where the underlying claim is based on slander. A revered bankruptcy treatise
applies the intent element to the knowledge of falsity, rather than knowledge of injury: "A
judgment obtained in an action of slander or libel may also be excepted from the operation of a
discharge, at least when the cause of action requires knowledge of the falsity of the published
statements and not mere reckless disregard for the truth or falsity of the statement." 4 COLLIER'S
ON BANKRUPTCY ¶ 523.12[5] (16th ed. 2019). A second leading bankruptcy treatise applies the
intent element to the act of making the statement, rather than knowledge of injury: "A debt based
on libel or defamation may be nondischargeable under § 523(a)(6) if the statement is made
intentionally and without just cause or excuse." GINSBERG & MARTIN ON BANKRUPTCY §
11.06[I][1] (6th ed. 2021).

These formulations can be explained by reference to caselaw. In 1979, the Ninth Circuit
concluded that the issue of whether a libelous statement was "willful" was determined by
whether the speaker knew the statement to be false. *Matter of Kasler*, 611 F.2d 308, 310 (9th Cir.
1979) ("'willfulness' denotes that the speaker knew his statements were false"). Concluding that
"libel liability in California can even be based on simply negligence," the Ninth Circuit

concluded that a libel judgment was not necessarily willful for non-dischargeability purposes. *Id*. This position was adopted by the Sixth Circuit in 1986. *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) ("The intentional tort of libel meets the requirements of § 523(a)(6) for non-dischargeability when the debtor/author knows the published statements were false.").

Seven years after *Wheeler*, an opinion was issued in *In re Thompson*, analyzing, in detail, the application of willfulness to a defamation judgment. 162 B.R. 748 (Bankr. E.D. Mich. 1993). Disagreeing that knowledge of falsity was the operative inquiry for "willfulness," the court found that the more appropriate inquiry was "whether the debtor intentionally published a defamatory statement."[13] *Id*. at 753. In reaching this conclusion, the court noted that "the act which results in injury is, by definition, the publication of a defamatory statement," and that "[t]hat the defamatory statements happens to be true will generally render the publication not actionable, but it does not render it any less defamatory –i.e., injurious." *Id*. at 752. Under this reasoning, *In re Thompson* concluded that the state of mind of the speaker with regard to the truth of the statement was related to the maliciousness prong, not to the willfulness prong.

After *In re Thompson* was decided, the Supreme Court issued its opinion in *Kawaauhau*, more clearly articulating its standard of willfulness, and shifting the focus from the actor's state of mind regarding his actions to the actor's state of mind regarding the injury. Subsequent to *Kawaauhau*, the Sixth Circuit returned to the issue of whether a defamation judgment necessarily

---

[13] The Court points out that *In re Thompson* noted that *Wheeler's* statement that "[t]he intentional tort of libel meets the requirements of § 523(a)(6) for non-dischargeability when the debtor/author knows the published statements were false" combined the "willfulness" and "maliciousness" prongs into one, and cited two cases. One of those cases concluded that knowledge of falsity was required for "willfulness" and the other concluded that knowledge of falsity was required for "maliciousness."

satisfies the "willfulness" prong. *See In re Kennedy*, 249 F.3d 576 (6th Cir. 2001). Now focusing

on the state of mind of the actor with regard to the injury, the Sixth Circuit concluded that

defamation *per se* did, in fact, necessarily involve a willful act. To wit:

> [I]t is presumed that when Debtors made statements as to Creditors' chastity in
> the case at hand, they were substantially certain that harm would result because
> such statements are considered defamation *per se*. . . .
> [T]he statements at issue are defamation *per se* under Michigan law, meaning that
> the courts presume that the speakers make such statements knowing that
> substantial harm or injury will result.

*Id*. at 582-83.


The Court has extensively researched the post-*Kawaauhau* caselaw that considered the legal

relationship between the elements of a state law claim for defamation and the elements of a non-

dischargeability claim pursuant to 11 U.S.C. § 523(a)(6). Unfortunately, none of this caselaw is

binding or particularly detailed in its application of § 523(a)(6) to defamation causes of act.

Some cases, either explicitly or implicitly, reflect the reasoning outlined in *Kennedy*. *See, e.g.*, *In

re Day*, 409 B.R. 337, 343 (Bankr. D. Md. 2009) (citing *Kennedy* and finding that defamatory

*per se* statements were necessarily willful); *In re Bland*, 1999 WL 33520530 at *5 (Bankr. N.D.

1999) ("[D]efamation by libel is an intentional tort. Therefore, the Court concludes that the

jury's finding that Bland committed defamation by libel necessarily included a finding that

Bland's conduct was 'willful' within the meaning of section 523(a)(6) because intentional torts

satisfy the element of 'willfulness.'"); *see also In re Stanton*, 2010 WL 757804 at *11 (Bankr.

N.H. 2010) (finding willfulness necessarily satisfied by defamation judgment). Other cases,

without address the unique underpinnings of defamation causes of action, simply summarily

conclude that a defamation judgment is not collateral estoppel because specific intent is not an

element of the underlying action. *See, e.g.*, *In re Kauanui*, 2015 WL 359088 at *3 (Bankr. D.

Hawaii 2015) (defamation claim not collateral estoppel as to willfulness); *In re Rizzo*, 337 B.R.

180 (Bankr. N.D. Ill. 2006) (willfulness requires intent to harm and maliciousness requires

knowledge of falsity); *see also In re Provencher*, 2020 WL 7787036 (Bankr. W.D. Tex. 2020);

*In re McCabe*, 588 B.R. 428 (E.D. Pa. 2018); *In re Palmer*, 555 B.R. 611 (Bankr. N.D. Ohio

2016); *In re Faller*, 547 B.R. 766 (Bankr. W.D. Ky. 2016); *In re Maxey*, 395 B.R. 665 (Bankr.

W.D. Mo. 2008).

There is a third line of cases that, in the Court's view, offers more persuasive analysis in support

of its conclusion. The Sixth Circuit, interpreting a child pornography statute that, like

defamation, presumed injury, offered the following analysis:

> As *Geiger* emphasizes, a debtor might act intentionally but simply not know that
> the act will cause injury. That is typically the case with judgments involving
> negligence. In such cases, the creditor will need to show that the debtor knew
> injury would result from his actions to except the judgment from discharge.
>
> But the law will sometimes presume that injury results from an act. Such is the
> case for false statements imputing a lack of chastity, which are defamatory per se.
> The law presumes that those statements will injure. **Thus, all a creditor needs to
> prove to except a defamation per se judgment from discharge is that the
> debtor knew the facts which made his statements actionable: that they were
> false and published without privilege to a third party. The judgment
> precludes the debtor from arguing that he thought his words weren't
> harmful. Any debtor who makes a knowingly false, defamatory per se
> statement is at least substantially certain that his statement will injury.**

*In re Boland*, 946 F.3d 335, 338-39 (6th Cir. 2020) (citations omitted and emphasis added).

While, at first glance, it may appear that the Sixth Circuit's opinion in *Boland* has implemented a

lower standard than that outlined in *Kawaauhau*, in fact these cases recognize the unique

underpinnings of defamation and the foundational maxim that "every man must be held to intend

the natural and probable consequences of his deeds." *Landress v. Phoenix Mut. Life Ins. Co.*, 291

U.S. 491, 500 n.2 (1934). The Ninth Circuit recognized this maxim in the context of a

willfulness analysis in a non-dischageability proceeding in *In re Ormsby*: "§ 523(a)(6)'s willful

injury requirement is met only when the debtor has a subject motive to inflict injury or when the

debtor believes that injury is substantially certain to result from his own conduct. The Debtor is

charged with the knowledge of the natural consequences of his actions." 591 F.3d 1199, 1206

(9th Cir. 2010). When the operative state law cause of action provides that injury necessarily

follows a certain act –like statements that are defamatory *per se*, or, as in the case of *Boland*,

certain actions related to child pornography – then whether the injury at issue naturally follows is

no longer a question of fact. As a matter of law it has been determined that it does, and,

therefore, the actor is charged with knowledge of that injury.[14]

This more nuanced, middle ground is the approach adopted by the courts of appeal that have

decided the issue, COLLIER'S ON BANKRUPTCY, and many bankruptcy courts. *See e.g.*, *In re*

*McCabe*, 856 Fed. Appx. 430, 431 (3rd Cir. 2021) ("The CCP's imposition of punitive damages

is not dispositive because, under Pennsylvania law, punitive damages may be awarded in a

defamation case on a finding of either recklessness or knowledge of the statement's falseness.");

---

[14] To the extent that an argument could be raised that the injury presumed, general damage to reputation, is distinct
from the specific injury that forms the basis of the Judgment, the Court notes that there is extensive caselaw finding
such a distinction to be irrelevant. *See, e.g.*, *Cohen v. de la Cruz*, 523 U.S. 213, 220 (1998) (construing "debt for"
language in § 523 broadly to mean any debt that is a result of or related to the injury); *see also In re Cecchini*, 780
F.2d 1440, 1443 (9th Cir. 1986) (all liabilities resulting from willful and malicious conduct are nondischargeable).

*In re Marshall*, 264 B.R. 609, 630 (C.D. Cal. 2001) ("Libel and defamation claims are nondischargeable under § 523(a)(6) when the statements were made with actual knowledge of their falsity."); *In re Mason*, 1999 WL 58579 at *3 (Bankr. S.D.N.Y. 1999) ("The intentional tort of defamation may constitute 'willful and malicious injury' by the debtor to another entity under § 523(a)(6) of the Bankruptcy Code, as long as the debtor knew the published statements were false."); *see also In re Herring*, 2021 WL 1604327 (Bankr. E.D. Pa. 2021); *In re Landon*, 2020 WL 4658284 (N.D. Okla. 2020); *In re Scarbrough*, 516 B.R. 897 (Bankr. W.D. Tex. 2014) (applying collateral estoppel to defamation judgment); *In re Braun*, 327 B.R. 447, 451 (Bankr. N.D. Cal. 2005) (collective cases finding statutory damages non-dischargeable). Given that framework, and applying the willfulness prong to a cause of action under CAL. CIV. CODE § 46, the Court adopts this middle approach and concludes that collateral estoppel does not apply to satisfy the willfulness prong because knowledge of the falsity of the statements at issue is not an element of the state law cause of action. *See, e.g.*, RESTATEMENT (SECOND) OF TORTS §580B (liability attaches to slander per se cause of action if the speaker: (a) knows that the statement is false; (b) acts in reckless disregard; or (c) acts negligently); *see also Brown v. Kelly Broadcasting Co.*, 48 Cal. 3d 711, 749 (Cal. 1989) (adopting negligence standard); *Oleumtech Corp. v. Sheriff*, 2013 WL 12121871 at *8 (C.D. Cal. 2013) (in defamation case, "[n]egligence is shown where there is a lack of 'reasonable care in checking on the truth or falsity of the information before publishing it.'") (*quoting Carney v. Santa Cruz Women Against Rape*, 221 Cal. App. 3d 1009, 1016 (Cal. Ct. App. 1990)).

In accordance with the foregoing, the remaining issue for trial was Defendant's knowledge of the falsity of the defamatory statements. The Judgment having previously determined that the

statements in question were false, the issue for trial was not whether the statements were true or false (as that had been decided by the Judgment), but whether Defendant *believed* the statements to be true or false when made.

### D. Defendant's Knowledge of the Falsity of the Defamatory Statements

While Plaintiff carries the burden of proof in this action, the only remaining issue is a "state of mind" issue upon which direct evidence is uncommon, and circumstantial evidence often necessary." *See, e.g.*, *In re Jones*, 276 B.R. 797, 802 (Bankr. N.D. Ohio 2001) ("More often that not, however, direct evidence of a debtor's state of mind will not be available given the simple fact that a debtor is unlikely to ever admit that he or she intended to cause an injury, or that he or she was substantially certain that an injury would result. As a result, a party, who seeks to demonstrate that a debtor acted "willfully" for purposes of § 523(a)(6), must normally establish this requirement indirectly through the utilization of circumstantial evidence."). "And, 'when determining the debtor's intent under § 523(a)(6), there is a presumption that the debtor knows the natural consequences of his actions.'" *In re Rodriguez*, 568 B.R. 328 (Bankr. S.D. Cal 2017) (*quoting Le v. Huynh*, 2016 WL 5956652 at *5 (B.A.P. 9th Cir. 2016).

Here, the Court has been presented with *direct evidence* that indicates that Defendant had knowledge of the falsity of the statements at issue. During the concluding day of trial, Plaintiff attempted to directly ask Defendant about whether he had knowledge of whether the statements he made were true or false. To wit:

*Plaintiff*: So what I'm trying to get on the record is that Mr. Sangha has personal knowledge as to the truth or the veracity of as to whether these allegations were true or false. He was a party to these allegations. He knows whether they are true or false.

*Defendant's Counsel*: That's undisputed.

*The Court*: Okay. So you're trying – so your point is you're trying to get him to admit that these statements were not true?

*Plaintiff*: No. That's irrelevant.

*The Court*: Sure

*Plaintiff*: What I'm trying to do is get him to admit that he has knowledge as to whether or not these are true or false.

*Defendant's Counsel*: It's undisputed. He has knowledge that these statements are true or false.

[Dkt. No. 552, pgs. 73-74] (edited to remove statements not completed). During another exchange not long after, Plaintiff engaged in a similar line of inquiry, and received a similar response:

*Plaintiff*: [sic] Based on that personal knowledge, you would know whether or not that allegation was true or false, is that correct?

*Defendant*: Which allegation are we talking about?

*Plaintiff*: Well, let's start with the first one, that I had physically abused you.

*Defendant*: Yes.

*Plaintiff*: And based on that personal knowledge, you would have knowledge as to whether or not your allegation that I had verbally abused you was true or false. Is that correct?

*Defendant*: Yes.

*Plaintiff*: So do you want to stipulate to that or do you want me to through the list?

*Defendant's Counsel*: I already have. We've already stipulated.

*The Court*: This is a somewhat different question. So I'm not trying to get to your end game necessarily, but what Mr. Schrader is asking is that all these things you stipulated to that you have personal knowledge of –

*Defendant's Counsel*: He would know whether they're true or false.

*The Court*: He would know whether they're true or false.

*Defendant's Counsel*: Yes. Yeah, I know what he's trying to do.

*The Court*: Okay. I take it from your comment you don't have a problem stipulating to that?

*Defendant's Counsel*: Yeah, if he has personal knowledge of something he would know of whether it's true or false.

*The Court*: Okay. So stipulated? Okay. There you go.

[Dkt. No. 552, pgs. 85-87].[15] And, finally, immediately prior to this exchange, the following

occurred:

> *The Court*: So, for example, the proposed stipulation to you, Mr. Schrader, is that
> as you had indicated the part where Mr. Sangha said that during the relationship
> Mr. Schrader was abusive physically were that is – in the report as being stated by
> Mr. Sangha anything like that they will stipulate was based on his personal
> foundation.
> In contrast, on page 4 – this is the fourth paragraph starting with "He said that Mr.
> Schrader had described to him a previous relationship that Mr. Schrader had with
> a person named Robert Burns," that description is clearly not from – that
> allegation is clearly not from Mr. Sangha's personal knowledge. The only
> personal knowledge he would have is of his conversation with you. He would not
> be stipulating to having personal knowledge of anything having to do between
> you and Mr. Burns.
> *Plaintiff*: Correct.
> *The Court*: Okay. So is that acceptable to you?
> *Plaintiff*: Yes.
> *The Court*: Okay. So stipulated?
> *Defendant's Counsel*: So stipulated.
> *The Court*: So stipulated. So everything in the report, other than expressly
> attributable to a third party, such as your relationship with Mr. Burns, Mr. Sangha
> stipulates that he has firsthand knowledge, personal knowledge.

[Dkt. No. 552, pgs. 84-85].

Thus, Defendant stipulated he had knowledge of the truth or falsity of the defamatory statements,

which the State Court had already determined to be false. As such, Defendant has in effect

---

[15] The Court notes that, despite being presented with an extensive, detailed tentative ruling explaining the Court's
framing of the sole legal issue remaining for trial – willfulness – Defendant and/or Defendant's Counsel appear to
have misunderstood that legal issue. For example, during the third day of trial, Defendant's Counsel made the
following statements: (1) "That's what we're litigating is whether Mr. Sangha had the intent to injure Mr. Schrader
by costing him the job." [Dkt. No. 552, pg. 43, lines 1-3]; and (2) the Court: "But what we're dealing with now is a
slightly different issue. It's whether Mr. Sangha's belief at the time. Defendant's Counsel: "No, I think it's the intent
to injure." [Dkt. No. 552, pg. 72, lines 17-20].

stipulated to knowing the statements were false. Setting aside this stipulation, simply for the sake

of argument, ultimately there was a single legal issue remaining for trial – whether Defendant

believed the statements he made were false when he made those statements. As consistently

emphasized by the Court during the course of this litigation, a state court already found that the

statements at issue were false, and this Court has repeatedly held that applying collateral estoppel

was appropriate and that the actual truth of the statements was not a defense.[16] As a result, the

only appropriate defense related to Defendant's belief regarding the truth of the statements.

Defendant's entire trial defense to the willfulness element of 11 U.S.C. § 523(a)(6) was that he

acted willfully and knowingly, but that he did not do anything wrong (i.e. legally actionable).

Despite the Court having detailed the remaining issue to be decided *ad nauseam*, Defendant has

decided to apparently concede that issue, while attempting to relitigate the merits of the

defamation cause of action.


Notwithstanding this background, for purposes of clarity, the Court finds it appropriate to further

illustrate the distinction between an appropriate defense to a § 523(a)(6) action after a judgment

sounding in tort has been entered, and a defense which merely seeks to relitigate the state court

action. If a conversion judgment has been entered against a debtor in state court, an appropriate

defense to the element of willfulness[17] would be "I did not believe that the property belonged to

the Plaintiff." On the other hand, a defense that "the property did not belong to the Plaintiff"

constitutes an impermissible attempt to relitigate the underlying state court action. Such a

defense does not amount to a contention that the debtor did not act willfully, but merely

---

[16] To the extent necessary, the Court notes that the state court's finding that the statements were false clearly
satisfies the five-factor collateral estoppel test laid out in *Lucido* and cited by *Plyam*.
[17] And/or maliciousness, depending on the relative construction of the two elements.

represents a claim that the state court judgment was erroneous.[18] And, given the application of

collateral estoppel, the Court is not resolving whether Defendant committed a wrongful act (in

this case, defamation), but is merely determining whether Defendant acted willfully when that

act was done – an issue that appears to not be in dispute.

Furthermore, even apart from Defendant's stipulation that he had personal knowledge regarding

the majority of the statements, and that if he had personal knowledge regarding the statements,

he would know whether they were true or false, the logical presumption that a person making a

statement about a life experience would know the truth or falsity of the statement has not been

rebutted by Defendant. Rather, Defendant has simply offered no material evidence upon which

the Court could conclude that Defendant could be mistaken regarding the truth or falsity of the

statements, and thus not have acted willfully. Thus, Plaintiff has met his burden on the

willfulness burden.

### E.  Alternative Standard: Intent to Injure

In section V.C, *supra*, the Court has analyzed the relationship between 11 U.S.C. § 523(a)(6) and

slander *per se*. For the reasons set forth in that section, the Court has concluded that the proper

legal test for willfulness under § 523(a)(6) when the underlying claim is a claim for slander *per
se* is whether the speaker knew the statements were false when the statements were made.

---

[18] That the property did not belong to the plaintiff does not necessarily imply that the defendant did not believe the property belonged to the plaintiff at the time of the conversion. As a result, defendant could have acted willfully but, by mistake, not done anything legally actionable. Whether the act is actionable, however, can be determined by the state court, and, if so determined, the bankruptcy court is merely left to review the willfulness of the act.

Given the lack of consensus on the proper application of willfulness to a claim of slander *per se*, the Court will briefly discuss the alternative legal standards, although the application may simply naturally follow from the articulation of the standard itself. For example, if willfulness is characterized in the matter used by GINSBERG & MARTIN ON BANKRUPTCY – whether the utterance of the statement was intentional – then there is clearly no dispute that the willfulness standard has been satisfied.

The application of the typical definition of willfulness – whether the actor intended the injury – is not so straightforward in the context of defamation *per se* for two important reasons.  First, defamation *per se* applies to statements that necessarily cause harm as a matter of law. Second, there is the foundational maxim that "every man must be held to intend the natural and probable consequences of his deeds." Combining these two rules results in the conclusion that a person who has committed slander *per se* must be held to have intended to cause injury to the subject of the statement.

There are recitations of that foundational maxim that characterize the maxim as a presumption rather than a strict rule. But, even applying this less strict formulation, Defendant has simply offered no evidence upon which the Court could conclude that the presumption has been rebutted. Specifically, Defendant has offered no explanation as to how he could have made statements that were defamatory *per se* but were not intended to cause any injury. Nor is it readily apparent what a plausible rebuttable of that presumption would look like because the most common rationale to rebut that presumption – that the action was undertaken to benefit the

defendant rather than harm the plaintiff – is clearly unavailable here. As a result, for the reasons

briefly discussed here, the Court alternatively concludes that, legally, Defendant intended to

injure Plaintiff when the statements were made.

VI.    *Defendant's Remaining Arguments*

The pre-trial and post-trial briefs [Dkt. Nos. 510 and 553] filed by Defendant focus on applying

an articulation of the remaining legal issue that conflicts with the articulation the Court provided

the parties, and largely attempts to ground the defense on an assertion of the truthfulness of the

statements. The post-trial brief only contains two categories, the latter being a single paragraph.

Addressing the latter section first, the section reads, in its entirety:

> There is no evidence in the record that Sangha was subjectively certain that his
> statements to Foreman would cause the SJFD to withdraw its conditional offer of
> employment to Schrader. The SJFD always exercised complete discretion over its
> hiring practices. Sangha could not possibly be certain how the SJFD would
> exercise that discretion or how it would consider his statements to Foreman in
> doing so. Such issues were always beyond Sangha's control and knowledge.

[Dkt. No. 553, pg. 8, lines 8-13]. Setting aside the issue that Defendant is arguing based on a

legal standard different from that detailed by the Court, and the issue that withdrawal of the

conditional offer of employment may arguably be a natural consequence of Defendant's

statements, and, therefore a consequence he would be presumed to intend, the Court notes that

the primary "injury" in this case is not lost compensation from employment. Rather, the primary

"injury" is general damages to reputation – damages that state law provides naturally follow

from statements of the sort that Defendant made. Ultimately, the argumentation regarding the withdrawal of the SJFD conditional offer of employment is a red herring.

Turning to the first section of Defendant's post-trial brief, the section is primarily focused on asserting that Defendant answered the questions truthfully. As discussed extensively in this opinion and during previous hearings, and as discussed in the Opinion, Defendant is not able to ground a defense against willfulness on the contention that the statements were true and, as a result, the underlying state court judgment erroneous. This Court having (repeatedly) found that applying collateral estoppel is appropriate in this case, and the falsity of the statements being a material and necessary element of the underlying state court action, Defendant is precluded from arguing that the statements were true. *See* Docket No. 277, pg. 10 (*citing Gottlieb v. Kest*, 141 Cal. App. 4th 110 (Cal. Ct. App. 2006) ("Default judgment conclusively establishes, between the parties so far as subsequent proceedings on a different cause of action are concerned, the truth of all material allegations contained in the complaint in the first action, and every fact necessary to uphold the default judgment.") and *In re Moore*, 186 B.R. 962, 962 (Bankr. N.D. Cal. 1995) ("The collateral estoppel effect of the Default Judgment therefore precludes Defendant from challenging any of the material factual issues that were both raised in the State Court pleadings and necessary to uphold the judgment.").

*VII.    Conclusion*

Based on the analysis set forth above, the Court finds that Plaintiff has met his burden to

establish the elements of § 523(a)(6), and that the debt reflected by the Judgment is

nondischargeable. Judgment will be entered accordingly.

###

Date: September 30, 2022

Mark Houle
United States Bankruptcy Judge